# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JAY A. EILERMAN, *et al.* ,          :

          Plaintiffs,

        -vs-

CARGILL, INC.,
d/b/a CARGILL OILSEED PROCESSING,

          Defendant.          :

Case No. 3:04-cv-034

District Judge Thomas M. Rose
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

This case is before the Court on Defendant Cargill, Inc.'s Motion for Summary Judgment, (Doc. 31), and on Plaintiffs' Motion for Partial Summary Judgment.  (Doc. 29).  The parties have fully briefed the issues, (Doc. 31, 35, 38; 29, 37, 33), and the matters are ripe for Report and Recommendations.

Plaintiffs Jay A. Eilerman and Jennifer M. Eilerman brought this action against Cargill, Mr. Eilerman's employer, alleging that Mr. Eilerman sustained serious personal injuries while on the job and as the result of an intentional tort which Cargill committed.  Mr. Eilerman seeks to recover compensatory damages, including future damages, as well as punitive damages. Mrs. Eilerman has brought a claim against Cargill for loss of consortium and she seeks compensatory damages for that claim.

Cargill has filed the present Motion alleging that Mr. Eilerman is unable to establish

a claim for an employer intentional tort claim. Cargill's position is that Mr. Eilerman cannot establish any of the three prongs of the test articulated by the court in *Fyffe v. Jeno's*, 59 Ohio St.3d 115 (1991). Cargill also argues that Ms. Eilerman's claim for loss of consortium is a derivative claim and because Mr. Eilerman's claim fails, her claim also fails.

Mr. Eilerman, of course, disputes Cargill's arguments. Mr. Eilerman's position is that there is a genuine issue of material fact as to each of the *Fyffe* elements.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157-59 (1970). Nevertheless, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient

evidence at trial to withstand a Rule 50 motion for judgment as a matter of law. *See, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989). If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate. *Id.* The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

> The moving party
>
> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

With these principles in mind, the facts of this case, construed in the light most favorable to Plaintiffs are as follows.

In the Summer of 2001, Mr. Eilerman began working for Cargill at its Sidney, Ohio,

3

plant as an elevator/meal load operator. Deposition of Jay A. Eilerman, Oct. 19, 2004 at 22-25 (filed Feb. 17, 2005; Doc. 29, Attachments 7, 8, 9). Initially, Mr. Eilerman began working as a temp to hire and then began working full time in September, 2001. *Id.* at 6. As an elevator operator, Mr. Eilerman was responsible for operating the grain dryer and for providing the clean, dried soy beans for the next step in Cargill's operation. *Id.* at 24. Mr. Eilerman was responsible for loading the meal using a computer system that permitted the beans to flow into trucks and railcars which then delivered the product to market. *Id.*

Cargill provides safety training to each employee on his hire date, at thirty (30) days and ninety (90) days after the hire date, and at mandatory monthly training sessions which Cargill holds at its plant. *Id.* at 40. 43. 44. 50; Affidavit of Joseph F. Peanasky, Feb. 15, 2005; (Doc. 31, Attachment 1). As a Cargill employee Mr. Eilerman was aware of Cargill's philosophy of "safety first" as opposed to "production before safety". Eilerman Depo. at 83.

One of the safety policies and procedures about which Cargill's Sidney plant employees are trained is lockout/tagout. *Id.* at 54; Peanasky Affidavit. Lockout/tagout refers to the procedure of an employee isolating from all energy sources the piece of equipment the employee is working on for any reason including repairs or maintenance. Eilerman Dep. at 41. Essentially, the employee locks out any power source to the piece of equipment and then puts on a tag which identifies the employee who locked out the energy source. *Id.*; Deposition of Robert G. Fridley, Oct. 19, 2004 at 38 (filed Feb. 17, 2005; Doc. 28, Attachments 3, 4).

Mr. Eilerman received lockout/tagout procedure training on June 20, 2001; August 10, 2001; December 28, 2001; and January 20, 2002. Eilerman Depo. at 35, 38, 43, 54; Fridley Depo. at 40-41. As a part of the lockout/tagout procedure training, Mr. Eilerman received a

4

lockout/tagout safety booklet, viewed a video, and watched his supervisor demonstrate the procedure. Eilerman Depo. at 53-55. Mr. Eilerman knew and understood the importance of the lockout/tagout procedure, understood that lockout/tagout was a requirement of working at Cargill, had used the lockout/tagout procedure, and he expected to be disciplined for failing to follow that procedure. *Id.* at 41, 56, 57, 64.

On or about February 1, 2002, Cargill made a programing change to the computer system which controlled the loading operation. Deposition of Joseph Peanasky, Dec. 20, 2004 at 19-22 (filed Feb. 17, 2005; Doc. 28, Attachment 5). Prior to the programing change, the meal load operator would select option 1 for hulls, option 2 for 47% meal, and option 3 for 48% meal. *Id.* at 17-18. When Cargill began selling another option which was 47.5% meal the computer programing was changed and option 3 became 47.5% meal and an option 4 was added for 48% meal. *Id.*

On February 10, 2002, Mr. Eilerman was scheduled to start work at 5:00 p.m. and his shift was scheduled to end on February 11, 2002, at 5:00 a.m. Eilerman Depo. 64-65. Mr Eilerman was scheduled to work that shift with Richard Danzig. Deposition of Richard Q. Danzig, Oct. 19, 2004 at 7-8 (filed Feb. 17, 2005; Doc. 28, Attachment 6). During Mr. Eilerman and Mr. Danzig's shift they were in the control room and had loaded several rail cars which was accomplished by Mr. Eilerman inputting the information into the computer. *Id.* at 9. At about 4:00 a.m., Mr. Eilerman and Mr. Danzig were in the control room of the "48 tank" when another railcar arrived which needed to be loaded. *Id.* Mr. Eilerman entered the necessary information into the computer by selecting option 4 and nothing happened–the 48 tank did not open to dispense the meal. *Id.* Indeed, the computer screen should have changed from a blue color to a green color indicating the tank had opened to dispense, but the screen did not change color. *Id.* It appeared that the

5

computer did not recognize the new option.

Mr. Eilerman did not tell Mr. Danzig what he planned to do other than to say that he knew how to open the tank manually. *Id.* 11-12. He went to a cabinet in the control room and took out a fourteen-inch pipe wrench and went down to the 48 tank. *Id.* Without performing a lockout/tagout procedure, Mr. Eilerman climbed onto the top of the drag which is what the meal falls into, put the wrench on a spindle at the end of the motor, and turned it manually. *Id.* at 9; Peanasky Depo. at 21; Deposition of Gary P. Maul, Jan. 24, 2005 at 89 (filed Feb. 15, 2005; Doc. 28, Attachments 20, 21, 22). At one time, in order to cool the motor, there had been a fan connected to the spindle, but the fan and the guard had either been removed or had broken off some time prior to the date of these events. Deposition of Donald Deaton, Oct. 19, 2004 at 20-21 (filed Feb. 17, 2005; Doc. 28, Attachments 1, 2); Fridley Depo. at 15. As Mr. Eilerman was turning the wrench and rotating the spindle, Mr. Danzig told Mr. Eilerman that the gate was opening. Danzig Depo. at 10. As the gate began to open, the limit switch on the gate was cleared and it activated power to the motor. Deaton Depo. at 41; Danzig Depo. at 14, 21. The motor caused the spindle and, subsequently, the wrench to spin. Deaton Depo. at 40-31. The wrench handle hit Mr. Eilerman in the face and he was thrown from the drag. Danzig Depo. at 14-15. Mr. Eilerman suffered severe injuries and has no recollection of the incident. Eilerman Depo. at 74.

Nobody from Cargill's management nor any other Cargill employee ever instructed Mr. Eilerman to open the gate of the 48 tank with a wrench. *Id.* at 69. Nor did any of his supervisors or anyone in Cargill management ever require him to manually open the 48 gate with a wrench without first following the lockout/tagout procedure. *Id.* at 84. Mr. Eilerman thinks that he may have seen someone use a wrench on the doors of the bean silo when the doors have been

frozen, but he has never seen anyone use a wrench on the 44 or the 48 tanks. *Id.* at 70-73[1]. Mr. Eilerman expected that anyone who used a wrench to open or close a gate to lockout/tagout prior to doing so. *Id.* Prior to Mr. Eilerman's February 11, 2002, accident, nobody had ever been injured at Cargill by manually opening a gate or by failing to follow the lockout/tagout procedure. Peanasky Affidavit. Mr. Eilerman never had any concerns about his safety while at work at the Cargill plant, he never reported any safety concerns to Cargill's management personnel, and he has no knowledge of anyone expressing safety concerns about working on the 44 or 48 tanks. Eilerman Depo. at 80-82. Mr Eilerman is not aware of Cargill management personnel's having any knowledge of employees using a wrench to open either the silo or tank doors or gates. *Id.* There is no documentary or other evidence demonstrating that Cargill knew that Mr. Eilerman was going to use a pipe wrench on the shaft without first performing the lockout/tagout procedure. Maul Depo. at 96-97.

**<u>Defendant Cargill Inc.'s Motion for Summary Judgment</u>**

There is no dispute that this Court had jurisdiction over this matter by virtue of the parties' diversity of citizenship. *See* 28 U.S.C. §1332. Under these circumstances, Ohio substantive law applies. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938).

Cargill has moved for summary judgment as to Mr. Eilerman's claims on the basis that he is unable to satisfy the standard for establishing a claim for an intentional tort in the employment context. Cargill has moved for judgment as to Mrs. Eilerman's claim on the basis that because Mr. Eilerman's claim fails, her derivative claim fails as well.

---

[1] Although Mr. Eilerman was apparently unaware of anyone using a wrench on the 44 or 48 tank gates, Robert Fridley testified at his deposition that he had on one occasion used a wrench to turn the spindle to manually open the gate at issue, but that he had performed the lockout/tagout procedure prior to doing so. Deposition of Robert G. Fridley, Oct. 19, 2004 at 27-28 (filed Feb. 17, 2005; Doc. 28 Attachments 3, 4).

In Ohio, although the workers' compensation provisions provide employees with the primary means of compensation for injury suffered in the scope of employment, an employee may institute a tort action against the employer when the employer's conduct is sufficiently "egregious" to constitute an intentional tort. *See Sanek v. Duracote Corp.* 42 Ohio St.3d 169, 172 (1989). When an employer's conduct is sufficiently egregious to constitute an intentional tort, it is said that the employer's act occurs outside the scope of employment, and, thus, recovery is not limited to the workers' compensation provisions. *See Blankenship v. Cincinnati Milacron Chemicals, Inc.,* 69 Ohio St.2d 608, *cert. denied,* 459 U.S. 857 (1982).

An intentional tort is "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." *Hannah v. Dayton Power & Light Co.,* 82 Ohio St.3d 482, 484 (1998), *quoting Jones v. VIP Dev. Co.,* 15 Ohio St.3d 90 (1984). In order to succeed on an intentional tort claim against his employer, an employee must establish: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality, or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. *Fyffe v. Jeno's, Inc.,* 59 Ohio St.3d 115 (1991) (citation omitted). An employee must establish each of the three *Fyffe* factors; if he fails to do so, summary judgment in favor of the employer is appropriate. *Hannah,* 82 Ohio St.3d at 485.

For the following reasons, this Court concludes that Mr. Eilerman is not able to meet the *Fyffe* standard of establishing an intentional tort in the employment context.

8

With respect to the first prong of the *Fyffe* test, an employee is required to establish that his employer had knowledge of the existence of a dangerous process, procedure, instrumentality, or condition within its business operation. The evidence, however, has failed to reveal that Cargill had any knowledge that any employee had ever used a wrench to manually open the tank 48 gate particularly without first following the lockout/tagout procedure. Indeed, the evidence establishes that no Cargill employee, including Mr. Eilerman, had any concerns about safety while working at Cargill and, prior to Mr. Eilerman's accident, no employee had ever been injured while working on or near the 48 tank. As noted above, Mr Eilerman is not aware of Cargill having any knowledge of employees using a wrench to open either the silo or tank doors or gates and there is no documentary or other evidence demonstrating that Cargill knew that Mr. Eilerman was going to use a pipe wrench on the shaft without first performing the lockout/tagout procedure.

Mr. Eilerman argues that there were teeth marks on the spindle which were made by other employees using a wrench to manually open the gate just as he attempted to do. However, the mere presence of these marks on the spindle do not establish that they were made by any other employee using a wrench on the spindle. As already noted, Mr. Eilerman is simply unable to identify any employees who used a wrench to manually open the gate. Speculation as to the teeth marks on the spindle is insufficient to overcome Cargill's present Motion.

Mr. Eilerman also argues that Cargill had knowledge of the absence of a cover over the spindle. Mr. Eilerman's position seems to be that the absence of the cover was the proximate cause of the accident and subsequent injuries. However, the absence of a cover on the spindle was not the proximate cause of Mr. Eilerman's accident and injuries. In other words, Mr. Eilerman was not injured by the unprotected spindle. Rather, Mr. Eilerman was injured when he used a wrench

9

on the spindle without following the lockout/tagout procedure.

The second prong of the *Fyffe* test requires the employee to establish that the employer knew that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty. As noted above, there is no evidence that anyone at Cargill knew that Mr. Eilerman, or anyone else, would use a wrench to open the 48 tank gate, particularly without first following the lockout/tagout procedure. In fact, even Mr. Danzig, Mr. Eilerman's co-worker on the shift during which the accident occurred, did not know what Mr. Eilerman was going to do until he had actually done it. Additionally, nobody had ever been injured at Cargill when using a wrench to manually open or close gates or doors without following the lockout/tagout procedure.

This Court notes that the trend in Ohio's courts is to deny recovery on an employment-related intentional tort claim when the employee fails to use safety equipment provided by the employer, or fails to follow the employer's safety procedures, or acts in an unexpected manner. Those courts have concluded that the employee has failed to satisfy the second prong of the *Fyffe* test. *See Goodin v. Columbia Gas of Ohio, Inc*., 141 Ohio App.3d 207 (4th Dist. 2000)(employee failed to follow safety procedure and entered a building without having an oxygen monitor); *Maddox v. L.O. Warner, Inc.,* Case No. 15468, 1996 WL 50151 (2nd Dist. Feb. 7, 1996)(employee failed to purge a refrigerant line before brazing the line, a procedure about which the employee had been taught and which he had used on numerous occasions in the past); *McConville v. Jackson Comfort Sys., Inc*., 95 Ohio App.3d 297 (9th Dist. 1994)(employee failed to wear the ventilation mask he had been furnished); *Faust v. Magnum Restaurants, Inc.,* 97 Ohio App.3d 451 (10th Dist. 1994)(employee failed to use protective gear available to him; *Baggs v.*

*Clarklift of Columbus,* Case No. 95APE11-1501, 1996 WL 166754 (10th Dist. Apr. 9, 1994)(employee could have used a safer method to accomplish his task); *Jandro v. Ohio Edison Co.,* 167 F.3d 309 (6th Cir. 1999)(applying Ohio law)(employee failed to use a hot-line tool provided by the employer).

The present case is similar to the above-cited cases. Specifically, Mr. Eilerman failed to follow Cargill's lockout/tagout procedure before attempting to manually open gate of the 48 tank using a wrench. Mr. Eilerman's own expert, Gary Maul, testified that if Mr. Eilerman had followed the lockout/tagout procedure, then the motor would not have turned and if the motor had not turned, then Mr. Eilerman would not have been injured. Maul Dep. at 94-95. Stated differently, if Mr. Eilerman had followed the lockout/tagout procedure about which he had been trained on several occasions, he would not have been injured. Indeed, Mr. Eilerman himself testified that he expected that anyone who used a wrench to open or close a gate to lockout/tagout prior to doing so and that he would expect to be disciplined for failing to follow that procedure.

In order to satisfy the third prong of the *Fyffe* test, Mr. Eilerman must establish that under such circumstances and with such knowledge, Cargill acted to require him to continue to perform a dangerous task. Even assuming that Mr. Eilerman has established the first two (2) prongs of the *Fyffe* test, he has failed to satisfy this prong of the *Fyffe* test. As noted above, Mr. Eilerman testified that nobody from Cargill's management nor any other Cargill employee ever instructed him to open the gate of the 48 tank with a wrench and that none of his supervisors or anyone in Cargill's management ever required him to manually open the 48 gate with a wrench without first following the lockout/tagout procedure. In addition, Mr. Eilerman testified that he thinks that he may have seen someone use a wrench on the doors of the bean silo, but that he has never seen anyone use a

11

wrench on either the 44 or the 48 tanks.

This Court concludes that Mr. Eilerman has failed to satisfy any of the three prongs of the *Fyffe* test and therefore his intentional tort claim against Cargill fails.

A claim for loss of consortium is derivative in that the claim is dependent upon the defendant having committed a legally cognizable tort upon the spouse who suffers bodily injury. *Bowen v. Kil-Kare, Inc.,* 63 Ohio St.3d 84, 92-93 (1992). In the present case, Mrs. Eilerman's claim is derivative of Mr. Eilerman's claim and because Mr. Eilerman cannot establish his intentional tort claim against Cargill, Mrs. Eilerman's claim does not survive.

This Court concludes that there are no genuine issues of material fact as to either Mr. Eilerman's or Mrs. Eilerman's claims and that Cargill is entitled to judgment as a matter of law as to those claims.

It is therefore recommended that Defendant Cargill, Inc.'s Motion for Summary Judgment, (Doc. 31), be granted and that judgment be entered in favor of Defendant Cargill, Inc. and against Plaintiffs Jay A. Eilerman and Jennifer M. Eilerman dismissing the Complaint with prejudice.

**Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs have moved for summary judgment as to several of the defenses Cargill raised in its Answer. Because this Court has determined that Cargill is entitled to judgment as a matter of law as to all of Plaintiffs' claims, Plaintiffs' Motion for Partial Summary Judgment should be denied as moot.

May 21, 2005.

                                      s/ **Michael R. Merz**
                                      Chief United States Magistrate Judge

H:\DOCS\Eilerman_MSJ.wpd

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).